SO ORDERED: March 29, 2006.

_____
Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HILDA DENISE WALLACE | ) | CASE NO. 05-7417-AJM-13 |
| | ) | |
| Debtor | ) | |

**ORDER DENYING DEBTOR'S MOTION TO AVOID WHOLLY UNSECURED
MORTGAGE OF AMERICAN GENERAL FINANCE
AND ORDER DIRECTING DEBTOR TO FILE AMENDED PLAN**

This matter is before the Court upon the Debtor's Motion to Avoid Wholly Unsecured Mortgage of American General Finance ("American General") on property located at 3382 Auburn Court, Greenwood, Indiana, 46143 (the "Subject Property"). The Court finds that the value of the Subject Property does not render the mortgage of American General wholly unsecured, and therefore, for the reasons stated below, DENIES the Debtor's Motion.

*I. Facts*

Hilda Wallace (the "Debtor") filed her chapter 13 case on April 22, 2005 (the "Petition Date'). She purchased the Subject Property in December, 2000 for $181,000 [1] and has lived there since. The Debtor valued the Subject Property at $155,000 in her bankruptcy schedules as well as in her Motion to Avoid Wholly Unsecured Mortgage (the "Debtor's Motion") filed on June 13, 2005. The parties do not dispute that Wells Fargo Home Mortgage, Inc. ("Wells Fargo") holds a valid first mortgage and has filed a proof of claim in this case for $194, 945.62 (the "First Mortgage"). It is also undisputed that American General holds a second mortgage which is scheduled at $62,768.62 (the "Second Mortgage"). It is only the fair market value of the Subject Property that is disputed and whether there is any value to support the Second Mortgage. Nothing in the record suggests that either Wells Fargo or American General has a security interest in any of the Debtor's assets other than the Subject Property. Thus, this scenario fits squarely into Bankruptcy Code Section 1322(b)(2) and the question is whether Section 1322(b)(2)'s antimodification provisions apply to the Second Mortgage.

Hearing on the Debtor's Motion was held on March 9, 2006 wherein the Debtor appeared in person and by counsel Richard Shea; American General appeared by counsel, Stephen Andrews. At the conclusion of the hearing, the Court took ruling on the matter under advisement. This order constitutes written findings and conclusions to the extent required under Rules 9014 and 7052 of the Federal Rules of Bankruptcy

---

[1] On Schedule D (Real Property) the Debtor indicated that she purchased the Subject Property for $185,000 in December, 2000. The written appraisals of the parties, both of which were admitted into evidence, indicated a purchase price in December, 2000 of $181,000 (Debtor's appraiser) and $181,900 (American General's appraiser).

Procedure.

## *II. Discussion*

This chapter 13 case was filed before October 17, 2005 when the applicable provisions of BAPCPA [2] became effective. This Court has in detail analyzed the interplay between pre-BAPCPA Bankruptcy Code Sections 1322(b)(2), 1325(a)(5), and 506(a) and whether a *completely unsecured* junior mortgage can be "stripped *off*" (as opposed to whether an *undersecured* junior mortgage can be "stripped *down*"), and therefore there is no need to revisit that analysis here. See, *In re Gyger*, Case No. 00-14683-AJM-13 (May 2, 2001) and the cases cited therein. [3] Suffice to say that the Court's determination as to the value of the Subject Property will resolve the issue. If the Court finds that the value of the Subject Property exceeds $194,945.62, then there is value to support the Second Mortgage, and the Second Mortgage *cannot be modified under the bifurcation provisions of Section 506(a)*. That means that the *entire amount* of the Second Mortgage must be provided for as a secured claim in the Debtor's chapter 13 plan. In such case, American General as the holder of an allowed secured claim receives all the attendant rights afforded to secured claimants under 1325(a)(5) [4]. If the Court finds that the value of the Subject Property is less than $194,945.62, there

---

[2] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[3] The full text of the *Gyger* opinion is available from the Bankruptcy Clerk's website: www.insb.uscourts.gov.

[4] Section 1325(a)(5) sets forth the requirements for confirmation of a chapter 13 plan with respect to treatment of secured claims and provides that (1) the holder of a secured claim accepts the plan or (2) the plan itself must provide that the holder of the claim retains the lien securing the claim and the value to be distributed to the secured creditor under the plan is not less than the allowed amount of the claim; or (3) the debtor surrenders the property that secures the claim.

is no value to support the Second Mortgage, and it can be modified under Bankruptcy Code Section 1325(a) and stripped off under Sections 506(a) and (d). In such case, American General would hold a secured claim of $0 and an unsecured claim of $62,768.62 which would be treated as all other allowed unsecured claims under the Debtor's chapter 13 plan.

### A. Valuation of the Subject Property

Since the resolution here hinges on the value of the Subject Property, the Court turns to the evidence with respect to its valuation. 11 U.S.C. §506(a) allows "bifurcation" of an allowed claim. It provides that an allowed claim of a creditor is a secured claim "to the extent of value of such creditor's interest in the estate's interest in such property" and that said claim is an unsecured claim "to the extent that the value of such creditor's interest...is less than the amount of such allowed claim". That section goes on to provide that the value "shall be determined in light of the purpose of the valuation and of the proposed distribution or use of such property".

Real estate is valued according to fair market value principles; there are three recognized appraisal techniques available to determine fair market value, two of which are (1) the market, or comparable sales approach, the method used by both appraisers here, and (2) the cost approach, where the cost of construction (reproduction) is reduced by deprecation of the property. See, *In re Demoff*, 109 B.R. 902 (Bankr. N. D. Ind. 1989); *In re Zersen*, 189 B.R 732 , 738 (Bankr. W. D. Wis. 1995).

### 1. The Debtor's Appraiser

The Subject Property is a four bedroom, two and a half bath, two story house,

4

with 2,348 square feet.  It also has a two-car garage, a fireplace and a brick and wood exterior.   The Subject Property is located in an "upscale" neighborhood, and is very attractive, with exceptional landscaping.  Both appraisers indicated that, except for repair work needed on the exterior window casings, both the interior and the exterior have been well maintained.

Frederic W. Bauter, the Debtor's appraiser, viewed the Subject Property on or about November 14, 2005 and, according to his written appraisal report admitted into evidence, found it to have a fair market value of $184,500.  He arrived at this value by comparing sales of three homes located between one (1) and one and a half (1 ½) miles from the Subject Property, all in another subdivision, but all in the same township.  Two of the three sales occurred within the four months prior to the Petition Date and the third sale occurred after the Petition Date.  All of the comparable sales were of houses that had three bedrooms and two of the three were two story homes, with the third having a story and a half.  The largest of the three homes was at least 100 square feet smaller than the Subject Property, and Bauter adjusted the value of that property upward to account for this difference.  The Subject Property has only a crawl space whereas two of the three comparable homes had full basements; the values of those two were adjusted to account for this difference, also.  Two of the three comparable homes had vinyl siding with brick, and the exterior of the third was all brick.  Bauter also indicated that, even if the Subject Property was built as a "custom" home, it now, several years later could be considered a "tract" home given that fact that there were other houses in the same subdivision built by the same builder or similar to it.  Bauter also testified that the cost to repair the exterior damage to the window casings on the

5

first and second stories would run between $5,000 and $8,000 and therefore deducted $5,000 from each of the comparable sales to account for this maintenance needed on the Subject Property.

Bauter found the reproduction (replacement) cost of the improvements to be $229,410 which does not even include the value of the lot, estimated at $30,000. From the photographs admitted into evidence, the landscaping surrounding the Subject Property, in this Court's view, is exceptional and would be a major attraction to a buyer. Apparently Bauter agreed because he added an additional $10,000 for the landscaping and the deck on the back of the Subject Property. After deducting $38,243 for depreciation, Bauter's estimate of the *reproduction cost* of the Subject Property was $231,167.

### 2. *American General's Appraiser*

John M. Compton, American General's appraiser, viewed the Subject Property on or about June 23, 2005, and according to his written appraisal report admitted into evidence, found it to have a fair market value of $201,500, even after taking into account his conservative repair costs and reproduction costs. Compton also used sales of comparable homes to arrive at his valuation. The three comparable homes he used all were located approximately a third of a mile or less from the Subject Property and two of the three were in the same subdivision. Sale of two of the three comparable homes occurred in May, 2004, nearly a year before the Petition Date. All of the comparable homes had two and a half baths and two of the three had four bedrooms. Two were very similar in size to the Subject Property: the square footage of two comparable homes was less than 75 square feet smaller than the Subject Property.

The third was more than 500 square feet larger than the Subject Property and Compton adjusted the value of that comparable home downward to account for the difference. Two of the comparable homes, like the Subject Property, did not have full basements. Like Bauter, Compton made an adjustment for the exterior damage to window casings on the first and second stories and estimated that the repairs would cost $15,000, significantly higher that Bauter's estimated repair cost of $5,000. Had Compton used Bauter's repair estimate, the Subject Property would have a fair market value of $211,500.

Compton also was of the opinion that the Subject Property was a "custom home"; its builder was not a "production" or "tract" home builder, it had no vinyl siding, it had more visual "depth" with its recessed windows and it did not have a "standard" floor plan. Thus, Compton used the term "custom home" to describe the quality of the construction, the type of design, and the details of the home. Thus, a home initially built as a "custom" home retained that character, unlike Bauter's definition of a "custom" home.

As for the reproduction cost, Compton estimated the cost of the improvements to be $210,020, and valued the lot at $40,000. Like Bauter, Compton was impressed with the landscaping and deck and added an additional $12,000. However, Compton estimated that the Subject Property had depreciated more than Bauter had estimated; Compton deducted $47,010 for depreciation. Based on these conservative estimates, Compton's opined that the *reproduction cost* of the Subject Property was $215,010, lower than Bauter's estimated reproduction cost.

7

### *3. American General's Appraisal is Better Evidence of Fair Market Value*

Given the greater similarities of the comparable homes in both type and proximity to the Subject Property, the Court finds that Compton's appraisal is more persuasive and better evidence of the Subject Property's fair market value. The comparable homes used by Bauter were located at a much greater distance from the subject property than those in the Compton appraisal. For example, Bauter's comparable homes #1, #2, and #3 were 1.51 miles, 1.27 miles and 1.05 miles respectively from the Subject Property, and none were in the same subdivision. The sales used by Compton were of homes located .37 miles, .06 miles and .01 miles from the Subject Property. The evidence suggests that the Subject Property is a "custom" home in an "upscale" neighborhood; two of Bauter's comparable homes had a vinyl exterior, suggesting that those homes were more "tract" homes than "custom" homes.

The Court also finds that Bauter's appraisal places on the Subject Property what the Court believes is an unreasonably low appreciation factor for houses in the same subdivision. Bauter testified that the Subject Property was worth $184,500, only $3,500 more than what the Debtor paid for it over five years ago in December, 2000. This $3,500 increase in value would indicate that the Subject Property has appreciated only 1.9 % in a five year period or approximately .4% (four-tenths of a percent) per year. Yet, this appreciation rate is not consistent with the appreciation rates of the comparable properties used by Compton in formulating his opinion as to value. Compton's comparable sale #2 involved the sale of a home located on the same street as the Subject Property that was first purchased in May, 1995 for $178,000 and sold in May, 2004 for $230,000. This yields an appreciation rate over the nine years of 29.2 %,

8

or approximately a 3.2% appreciation rate per year.  Compton's comparable #3 was not in the same subdivision but was located little more than a third of a mile from the Subject Property and was purchased in October of 2001 for $168,000 and sold in May of 2004 for $207,900.  Thus, after only a little more than 30 months, that house appreciated $39,000, or approximately $15,900 per year, yielding an appreciation rate of 9.5 % per year.  Clearly these appreciation rates are much higher than the .4% appreciation rate Bauter attributed to the Subject Property.

Finally, in September of 2002, the Subject Property was listed for sale for $325,000, albeit apparently for a very short period of time.  This listing may not have been "intended" by the Debtor, but the fact remains that it was listed for $144,000 *more* than for what it was purchased less than two years before.  Now, over three years from that point, the Debtor alleges that the value of the Subject Property is $184,500.  Although the 2002 listing price was greatly inflated, the Court remains unconvinced that the Subject Property has appreciated only $3,500 in over five years.

### *III.  Conclusion*

Based on these findings, the Court concludes that the Second Mortgage is not wholly unsecured because the fair market value of the Subject Property is $201,500.  Because the value exceeds the amount of the First Mortgage, the Debtor's Motion to Avoid Wholly Unsecured Mortgage is DENIED.  The Debtor is ORDERED to file an amended chapter 13 plan consistent with this finding within thirty (30) days of the date of this Entry.

# # #

9

Distribution:

Richard Shea, Attorney for the Debtor
Stephen Andrews, Attorney for American General
Robert Brothers, Chapter 13 Trustee
Nancy J. Gargula, United States Trustee